UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. EDGARD EL CHAAR,

                          Plaintiff,

          -against-

NEW YORK UNIVERSITY COLLEGE OF
DENTISTRY,

                          Defendant.

ANALISA TORRES, District Judge:

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:  _03/28/2024_

22 Civ. 856 (AT)

**ORDER**

In this employment discrimination action, Plaintiff, Edgard El Chaar, a professor of periodontology, alleges that Defendant, the New York University College of Dentistry ("NYU Dentistry"), subjected him to a hostile work environment, refused to promote him, and constructively discharged him on the basis of his race and national origin. El Chaar asserts discrimination and retaliation claims pursuant to (1) 42 U.S.C. § 1981; (2) the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 296; and (3) the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8–107. *See* ECF No. 2 at 18–23. Pursuant to Federal Rule of Civil Procedure 56, NYU Dentistry moves for summary judgment. Def. Mot., ECF No. 36. For the reasons stated below, the motion is GRANTED as to El Chaar's § 1981 claims, and El Chaar's NYSHRL and NYCHRL claims are DISMISSED without prejudice to renewal in state court.

**BACKGROUND[1]**

In 1993, El Chaar graduated from dental school in Lebanon and moved to the United States to attend a one-year international program at NYU Dentistry. Def. 56.1 ¶ 1, ECF No. 50-2. For nearly

---

[1] The facts in this section are taken from the parties' Rule 56.1 statements, responses, and declarations, unless otherwise noted. Disputed facts are so noted. Citations to a paragraph in a Rule 56.1 statement also include the opposing party's response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted). On a motion for summary judgment, the facts must be read in the light most favorable to the non-moving party. *Id.* at 69.

twenty-six years, El Chaar was a NYU Dentistry employee—first, as a part-time faculty member from 1995 to 2012, and then as a full-time faculty member and program director of the postgraduate periodontology program from 2013 to 2021.  *Id.* ¶¶ 3–4.

NYU Dentistry is led by a dean and an informal executive committee.  *Id.* ¶¶ 6–9.  Since 2007, Charles Bertolami has served as dean.  *Id.* ¶ 6.  The school is divided into eleven departments, each of which has its own chair that reports to Bertolami.  *Id.* ¶¶ 5, 8.  He is the ultimate decision-maker in appointing chairs.  Pl. 56.1 ¶ 86, ECF No. 51.  The second-largest department—with over 120 faculty members—is the Department of Periodontology and Implant Dentistry (the "Department").  Def. 56.1 ¶¶ 28–29.

During El Chaar's first stint at NYU Dentistry, he taught one day a week at most.  *Id.* ¶ 53.  Faculty members made "sporadic" comments to El Chaar, who is Lebanese, about his ethnicity and race.  *Id.* ¶ 42; Pl. 56.1 ¶ 1.  El Chaar alleges that, between 1994 and 1997, a part-time faculty member called El Chaar a "camel-jockey," and that around 2001, the former program director of postdoctoral periodontology called El Chaar a "dirty Arab."  Def. 56.1 ¶¶ 43, 49.

In 2012, El Chaar left the Department to become the program director at Lutheran Medical Center.  *Id.* ¶ 53.  In August 2013, he returned to NYU Dentistry as the Department's program director of postdoctoral periodontology.  *Id.* ¶¶ 54, 58.  In May 2014, Peter Loomer, then the Department chair, recommended withholding El Chaar's raise for poor performance, citing his failure to hold required faculty meetings, his "authoritarian attitude," and complaints from residents and faculty about his "unprofessional behavior."  *Id.* ¶ 80; *see* ECF No. 38-18.  And, in November 2016, another professor complained that El Chaar "had treated her in an unprofessional, aggressive, and hostile manner," and had subsequently cut her out of Department business.  Def. 56.1 ¶¶ 89–90, *see* ECF No. 38-29.  However, the associate dean for graduate and postgraduate programs testified that El

Chaar improved the Department's postgraduate program during his tenure as program director.  Pl. 56.1 ¶ 23.

In August 2017, El Chaar filed a complaint with NYU's Office of Equal Opportunity ("OEO"), charging Loomer and two other professors, Roger Warren and Mitchell Bloom, with discrimination and retaliation.  Def. 56.1 ¶ 102.  Following interviews with El Chaar, Loomer, Warren, Bloom, and witnesses, on February 7, 2018, the OEO issued a report (the "OEO Report"), which concluded that "none of the individual respondents had engaged in conduct that by itself would rise to the level of a policy violation."  *Id.* ¶¶ 107–08; *see* OEO Report, ECF No. 38-36.  However, OEO found that certain allegations (the "Report Acts"), including that Loomer called El Chaar "anti-Semitic" and that Warren called him a "foreigner," were corroborated by at least one witness.  OEO Report at 20–21.  The sum of the Report Acts gave OEO "pause for concern" and led to the conclusion that "there is evidence to support [El Chaar]'s collective allegations of a hostile work environment."[2]  *Id.* at 21.  The OEO Report was provided to Bertolami, who, after conferring with the OEO investigator who wrote it, required NYU Dentistry faculty to attend a two-part training program "related to non-discrimination/anti-harassment."  *Id.* ¶¶ 110–12.

In the fall of 2018, Loomer announced that he would be resigning as Department chair to take a position in Texas.  *Id.* ¶¶ 121–22.  Because Loomer could not remain during the search for a permanent replacement, Bertolami decided to appoint an interim chair.  *Id.* ¶ 123.  In November 2018, Bertolami named Asgeir Sigurdsson, then chair of the endodontics department, as interim chair.  *Id.* ¶ 129.

---

[2] In notes dated April 25, 2018, Bertolami wrote to himself, "The OEO found that the [D]epartment had a hostile work environment; however, it was not attributable to anyone named by El Chaar.  My interpretation was that this was because it was clear that El Chaar was contributing his share to the hostile work environment."  ECF No. 44-3 at 2.  The OEO Report does not state that El Chaar contributed to the hostile work environment.  *See* Def. 56.1 ¶ 107.  The head of OEO at the time, Mary Signor, testified that it would have been noted in the OEO Report if the investigators had determined that El Chaar had contributed to the hostile work environment, but also stated that his contribution was not within the scope of the OEO Report.  Signor Tr. at 47:10–48:14, ECF No. 38-9.

Prior to Bertolami's appointment of Sigurdsson, El Chaar spoke to Bertolami about his interest in the interim position.  *Id.* ¶ 122.  According to El Chaar, Bertolami said, "[Y]ou complained to OEO, and we needed a cooling period."  El Chaar Tr. at 148:22–23, ECF No. 38-3.  El Chaar also testified that Bertolami said, "You complained.  Nobody is going to be in front of the [D]epartment, we are going to [have] an outside interim chair and we are going to let things cool down."  *Id.* at 150:6–9.

Bertolami testified that he did not recall the conversation with El Chaar, but remembered his feeling that "everyone would benefit from a cooling-off period, from a calming time under . . . Sigurdsson, who everyone liked and was an excellent administrator, who Dr. El Chaar liked."  Bertolami Tr. at 116:13–23, ECF No. 38-4.  Bertolami said that El Chaar's OEO complaint did not play a role in his decision to appoint Sigurdsson and was a "very minor thing that [he] thought was resolved."  *Id.* at 117:10–11.  Bertolami also said that there was "some hostility between the two divisions" of the Department, and "it seemed like there was . . . a general sense of unpleasantness in the [D]epartment long before Dr. El Chaar, but continuing even after he was there," so Sigurdsson, as an "excellent administrator, would provide some very good leadership in that department."  *Id.* at 117:19–118:8.  Bertolami claimed that this was a "routine way of operating academically, particularly when the [chair] is leaving," *id.* at 121:14–15, and was not an "impediment" to El Chaar's candidacy for the permanent position, *id.* at 122:8–9.[3]  Bertolami said that the Department had had an interim chair from 2010 to 2012—an administrator from outside the Department—"to sort out the various problems that existed, whether interpersonally or clinically" before he "opened a search for the definitive chair" in 2012.  *Id.* at 55:12–15, 59:6–60:23; *see* Def. 56.1 ¶¶ 32–35.

---

[3] Around December 2018, El Chaar made a retaliation complaint to OEO based on Bertolami not appointing him as interim chair.  Def. 56.1 ¶ 131.  OEO did not investigate the retaliation claim.  *Id.* ¶ 133.  The parties dispute why OEO did not do so: OEO claims that it lacked jurisdiction, and El Chaar says that it simply failed to follow prescribed practices. *Id.*  However, neither party argues that OEO's failure to investigate is material to El Chaar's claims.

El Chaar does not dispute that when Loomer resigned, the Department was "fractious" and faced issues with "(1) patient complaints, (2) concerns with the rigorousness of the requirements for the predoctoral program, and (3) differences among the faculty as to the vision for the Department, which created operational issues."  Def. 56.1 ¶ 126.  Bertolami hoped that Sigurdsson would "improve the situation in the Department to maximize the number of excellent candidates who would apply for the permanent position."  *Id.* ¶ 129.

By letter dated July 20, 2019, El Chaar asked Sigurdsson to remove from the Department Vera Tang and Robert Horowitz, two faculty members.  *Id.* ¶ 151; *see* ECF No. 38-41.  For the previous ten months, El Chaar had been feuding with them because Horowitz had said at a public conference hosted by Tang that the Department's "faculty destroyed the program," and El Chaar interpreted this comment to be about him.  *See* Def. 56.1 ¶¶ 142–50.  In the letter, El Chaar claimed that "[t]here continues to be a campaign waged against me on the basis of my ethnicity and religion," stating that Warren and Bloom—about whom he had made the earlier OEO complaint—accused him of being anti-Semitic; El Chaar, however, offered no further details.  ECF No. 38-41.  The letter indicated that El Chaar spoke with Sigurdsson about his concerns.  *Id.*

On June 27, 2020, El Chaar and Bertolami met via Zoom, and El Chaar recorded the conversation without Bertolami's knowledge.  Def. 56.1 ¶ 154.  Bertolami said that El Chaar would have been a "logical choice" as the interim chair but that Bertolami did not appoint El Chaar for "political reasons."  ECF No. 44-19 at 14:1–6.  Bertolami said that he did not appoint El Chaar as the interim in part to help El Chaar's chances of becoming the permanent chair.  *Id.* at 12:22–13:1, 14:1–6, 38:5–6.  Bertolami said that "[t]he dean is not the king" and that "people have to be willing to follow the" chair, so he thought that "what would benefit [El Chaar] is a period of cooling off.  Not [El Chaar] cooling off. . . . Other people cooling off."  *Id.* at 14:14–15:10.  El Chaar told Bertolami that his relationship with the faculty was now positive and that, although his relationship with Bloom

remained poor, he had made peace with Warren, whom he called "the main instigator." *Id.* at 27:10–28:12, 29:19–23.  The two discussed whether it was time to open a search for a permanent Department chair to replace Sigurdsson.  Def. 56.1 ¶¶ 155–56.  Bertolami said that if the search were opened, El Chaar "would be a strong candidate and would likely be the final choice for chair." *Id.* ¶ 157.

Following the Zoom meeting, Bertolami recommended to NYU Dentistry's executive committee that it was time to begin a search for a permanent chair.  *Id.* ¶ 158.  The search committee did not include "faculty who had a history of conflict with" El Chaar.  *Id.* ¶¶ 159–60.  El Chaar does not allege that any members of the search committee were biased against him.  *Id.* ¶ 165.  El Chaar applied, and the search committee recommended him as one of four finalists.  *Id.* ¶ 167.

Although Bertolami had the ultimate say in selecting the permanent chair, he consulted his executive committee.  Pl. 56.1 ¶ 86; Def. 56.1 ¶ 185.  Bertolami sought "a candidate with an outstanding academic record; a good teacher, clinically and academically; someone with credibility; a consensus builder; and someone very good at interpersonal relationships with a preference for a tenured full professor."  Def. 56.1 ¶ 169.  The four finalists interviewed with each member of the executive committee and gave a seminar via Zoom to the NYU Dentistry faculty.  *Id.* ¶¶ 170–71.  During his interview with Bertolami, El Chaar said that he planned to fire four or five members of the Department upon becoming chair, which concerned Bertolami.  Pl. 56.1 ¶ 81.  El Chaar also said that he would resign if he did not receive the promotion.  Def. 56.1 ¶ 190.  He had previously made a similar statement to Sigurdsson.  *Id.* ¶ 189.

Bertolami then sent a survey to the NYU Dentistry faculty to assess the seminars and each "candidate's suitability to be chair."  *Id.* ¶ 172.  Bertolami "regularly solicited the faculty's feedback when selecting a chair," *id.* ¶ 178, and he decided to use a written survey because the pandemic made it difficult for the faculty to gather in person, *id.* ¶ 173.  Bertolami was particularly interested in

"whether or not the faculty in Periodontology would be willing to be led by [] El Chaar" in light of El Chaar's interview comment. Pl. 56.1 ¶ 81. The survey was sent to 77 faculty members and was completed by approximately 40. Def. 56.1 ¶ 175. El Chaar testified that Tang, Wayne Kye, and Roya Mohajer—three faculty members, none of whom were discussed in the OEO Report—started a campaign to promote other candidates over him in response to the survey. Id. ¶ 176. El Chaar received the most first-place and the most last-place rankings in the survey. Id. ¶ 177. In the narrative fields, some faculty "thought very highly of" El Chaar, and others wrote that he was "vindictive," "divisive," "narcissistic," and "bullies" faculty and residents. Id.; see ECF No. 38-49.

On May 13, 2021, Bertolami offered the position of permanent chair to Leena Palomo, an external candidate, who accepted. Def. 56.1 ¶¶ 185, 187. Palomo was a tenured professor at Case Western Reserve University, and her professional memberships "suggested strong interpersonal skills, academic record, reputation and leadership." Id. ¶ 182; see Bertolami Tr. at 139:15–22. Bertolami testified that El Chaar was passed over because he was not on a tenure track, had previously been rejected for promotion, and used terms like "friends" and "enemies" to describe faculty in the Department. Def. 56.1 ¶ 183. Bertolami stated that El Chaar was still a "very good second choice" and would have been appointed as permanent chair if Palomo turned down the job. Id. ¶¶ 183, 186. El Chaar does not dispute that Bertolami's executive committee ranked Palomo first and ranked El Chaar second. Id. ¶ 181. Bertolami testified that El Chaar "was our second choice" prior to the survey, and, that if in the survey "the faculty had strongly favored [El Chaar], we certainly would have reconsidered" the decision to choose Palomo. Bertolami Tr. 156:12–15. El Chaar alleges that, in a phone call on May 13, 2021, Bertolami said, "[T]he survey came back negative against [you]. And based on the survey, I cannot give you the position." Pl. 56.1 ¶ 84; see Def. 56.1 ¶ 192. Bertolami asked El Chaar to stay on as program director, but El Chaar resigned later that day. Def. 56.1 ¶¶ 192, 195.

7

El Chaar brings this action, contending that he was (1) subjected to a hostile work environment; (2) denied promotion to the position of interim chair because of his OEO complaint; (3) denied promotion to the position of full-time chair both because of the survey—which he claims was infected with racial discrimination—and his OEO complaint; and (4) constructively discharged. *See generally* Pl. Opp., ECF No. 45.[4]

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the nonmoving party has the ultimate burden of proof at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the nonmovant cannot produce admissible evidence that supports the existence of a dispute of material fact. *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. "Although a party opposing summary judgment need not prove its evidence in a form admissible at trial or under the evidentiary

---

[4] On April 29, 2019, El Chaar's application for a promotion in rank from clinical associate professor to clinical professor was denied for reasons including a lack of scholarship. Def. 56.1 ¶¶ 137, 141. Defendant also moves for summary judgment on El Chaar's claims regarding this denial. *See* Def. Mem. at 14–15. El Chaar did not respond in his opposition papers, and the Court deems this theory abandoned.

standard which will be required, it must show facts sufficient to enable a reasonable mind to conclude that a material dispute of fact exists." *Healy v. Chelsea Res. Ltd.*, 736 F. Supp. 488, 491–92 (S.D.N.Y. 1990) (citation omitted).  In deciding the motion, the Court views the record in the light most favorable to the nonmoving party.  *Koch*, 287 F.3d at 165.

The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted).  That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).  To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

## DISCUSSION

### I.  Hostile Work Environment

#### A.  Legal Standard

For a § 1981 hostile work environment claim "[t]o survive summary judgment . . . , a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 261 (2d Cir. 2023) (quotation marks and citation omitted). To determine if a workplace is hostile or abusive, courts "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

the victim's job performance." *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (cleaned up).

The statute of limitations is four years for § 1981 claims. *Banks*, 81 F.4th at 260. But, the "very nature" of hostile work environment claims "involves repeated conduct" that "collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 117 (2002). Therefore, as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. The earlier acts must be related to the act falling within the filing period such that they all are "part of the same unlawful employment practice." *Id.* at 122. And, the timely allegation cannot be a "discrete act of discrimination," such as an employee's termination. *Murillo-Roman v. Pension Boards – United Church of Christ*, No. 22 Civ. 8365, 2024 WL 246018, at *7 (S.D.N.Y. Jan. 23, 2024).

B. Analysis

As an initial matter, the Court must decide which acts it can consider for El Chaar's hostile work environment claim. El Chaar filed his lawsuit in state court on October 6, 2021. ECF No. 2. Therefore, he can rely on conduct that occurred after October 6, 2017, for his § 1981 claim. El Chaar does not dispute that the Report Acts occurred before that date and cannot form the basis for a timely claim under § 1981.[5] *See* Pl. Opp. at 23–26. However, he contends that the Report Acts are still actionable because he was subjected to acts within the limitations periods that were part of the same hostile work environment. The Court disagrees.

El Chaar first argues that the Report Acts continued because the training in response to the Report Acts was "generic" and "not tailored to the specific racist harassment [he] experienced." Pl.

---

[5] El Chaar filed his OEO complaint in August 2017, and neither OEO nor El Chaar indicate that any of the Report Acts occurred after El Chaar's filing of the OEO complaint.

Opp. at 24.  "[A] failure to intervene can constitute actual participation in a hostile work environment."  *Tromblee v. N.Y. State Off. for People with Dev. Disabilities*, No. 19 Civ. 638, 2023 WL 2655471, at *15 (N.D.N.Y. Mar. 27, 2023).  But, "[a]n employer cannot be subject to a hostile work environment claim . . . if the employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct."  *Russell v. N.Y.U.*, 739 F. App'x 28, 30 (2d Cir. 2018) (cleaned up); *see Morgan*, 536 U.S. at 118 (noting that "intervening action by the employer" can interrupt a hostile environment claim).  Bertolami consulted the OEO investigator who authored the OEO Report and followed the investigator's recommendation that the training was the appropriate remedy.  Def. 56.1 ¶¶ 110–12; *see Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16 Civ. 4897, 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017), *R. & R. adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017) (taking into account whether the defendant "attempted to remedy" the conduct in the statute-of-limitations analysis).  Although El Chaar makes the claim that the training was "generic," he offers no evidence that it was inadequate.  Therefore, the purportedly deficient training cannot alone make the Report Acts timely.

El Chaar next claims that other faculty members continued to call him anti-Semitic solely because of his national origin, and argues that these incidents are part of the same course of conduct as the Report Acts.  Pl. Opp. at 25.  But, El Chaar has adduced no admissible evidence that these post-OEO Report incidents occurred.  Although El Chaar's July 20, 2019 letter to Sigurdsson stated that Warren and Bloom, against whom he had lodged his OEO complaint, called him anti-Semitic, he did not indicate when this incident occurred—and still does not.  *See* Def. 56.1 ¶ 151; Pl. 56.1 ¶¶ 52–53.  El Chaar separately claims that a lab technician and a colleague told him that others in the Department had called him anti-Semitic.  Pl. Opp. at 25; *see* Pl. 56.1 ¶¶ 60–61.  Hearsay statements such as this are inadmissible for the truth of the matter and, therefore, cannot be considered at

summary judgment.[6]  *See Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020).

Even if the Court were to consider these hearsay statements, El Chaar has not established that they were indeed part of the same course of conduct as the Report Acts.  The persons who allegedly called El Chaar anti-Semitic were not those named in the OEO report.  *Compare* ECF No. 44-16 (lab technician text message) *and* Pl. 56.1 ¶ 61 (colleague statement) *with* OEO Report at 20–21; *see Grimes-Jenkins*, 2017 WL 2258374, at *13 (refusing to consider allegations that "involve[d] distinct conduct by a number of different coworkers and supervisors" as part of the same employment practice).  And, in the recorded Zoom meeting, El Chaar told Bertolami that his relationship with the faculty was positive and that he had made peace with Warren, whom he called "the main instigator." *See* ECF No. 44-19 at 27:10–23, 29:19–23.

El Chaar's hostile work environment claim, therefore, rises or falls based on acts that occurred during the applicable limitations periods.  Aside from the alleged instances when certain faculty members called El Chaar anti-Semitic, which are inadmissible,[7] El Chaar points only to Bertolami's use of a faculty survey during the hiring process for the permanent chair.  Pl. Opp. at 27.  The survey relates to an alleged "discrete act of discrimination," namely a failure to promote, *see infra* Section II.C, and is, therefore, not properly considered as part of the hostile work environment claim. *Murillo-Roman*, 2024 WL 246018, at *7.  And, to the extent that El Chaar challenges the statements made in survey responses, he does not indicate that any were motivated by race or national-origin

---

[6] Plaintiff does not respond to Defendant's hearsay objection in his opposition papers or indicate that the cited materials could "be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("[A] court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned" (cleaned up)).

[7] Even if the Court were to consider the hearsay statements, El Chaar does not make out a hostile work environment claim.  The hearsay statements are too isolated to constitute "severe and pervasive" conduct in violation of § 1981.  *See Sykes v. Rachmuth*, No. 22 Civ. 3989, 2023 WL 2752865, at *7 (S.D.N.Y. Mar. 31, 2023) ("Isolated incidents or episodic stray remarks are not sufficiently continuous and concerted in order to be deemed pervasive." (quotation marks and citation omitted)).

discrimination.  *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 121 (S.D.N.Y. 2022)
(granting summary judgment when plaintiff "offered a laundry list of facially neutral allegations" and
did not "present any evidentiary basis to infer that the incidents alleged were . . . animated by
discriminatory intent" (cleaned up)).

Accordingly, Defendant's motion for summary judgment is GRANTED as to the hostile work
environment claim under Section 1981.

II.   Discrete Acts

A.  Legal Standard

Employment discrimination and retaliation claims under § 1981 are "governed at the
summary judgment stage by the burden-shifting analysis established by the Supreme Court in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)."  *Cardwell v. Davis Polk &
Wardwell LLP*, No. 19 Civ. 10256, 2023 WL 2049800, at *19–20, 24 (S.D.N.Y. Feb. 16, 2023)
(quotation marks and citation omitted).

Under *McDonnell Douglas*, the plaintiff bears the initial burden of proving by a
preponderance of the evidence a prima facie case of either discrimination or retaliation.  *Abrams v.
Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (discrimination); *Littlejohn v. City of New
York*, 795 F.3d 297, 316 (2d Cir. 2015) (retaliation).  To state a prima facie case of discrimination
under § 1981, a plaintiff must show: "(1) he belonged to a protected class; (2) he was qualified for the
position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment
action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v.
City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  To make a prima facie case of retaliation under
§ 1981, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of
the protected activity; (3) an adverse employment action; and (4) a causal connection between the
protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 316.

The burden then shifts to the defendant to offer a legitimate non-discriminatory or non-retaliatory reason for its actions. *Abrams*, 764 F.3d at 251 (discrimination); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (retaliation). Defendant can meet this burden "by introducing admissible evidence establishing a non-discriminatory [or non-retaliatory] rationale which, if believed by the trier of fact, would support the finding that race discrimination [or retaliation] did not underlie the adverse employment act." *Early v. Wyeth Pharms., Inc.*, 603 F. Supp. 2d 556, 573 (S.D.N.Y. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

If the defendant succeeds, the burden shifts back to the plaintiff to "establish that the defendant's reason is in fact pretext for unlawful discrimination," *Abrams*, 764 F.3d at 251, or that "retaliation was a substantial reason for the complained-of action," *Fincher*, 604 F.3d at 720. At the third step of the *McDonnell Douglas* framework, the Court "examine[s] the entire record, using a case-specific approach, to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff." *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 650 (2d Cir. 2020) (cleaned up).

## B. Failure to Appoint as Interim Chair

El Chaar contends that Bertolami did not appoint him as interim chair in retaliation for the OEO complaint. Pl. Opp. at 14–16. El Chaar has made out a prima facie case of retaliation. He participated in a protected activity by complaining to OEO about racial discrimination. *Fenner v. News Corp.*, No. 09 Civ. 9832, 2013 WL 6244156, at *24 (S.D.N.Y. Dec. 2, 2013) (protecting both "formal complaint[s]" and informal "complaints to management"). Bertolami knew about the protected activity. *See* Def. 56.1 ¶¶ 110–12. El Chaar suffered an adverse employment action: he was not promoted. *Feliciano v. City of New York*, No. 14 Civ. 6751, 2015 WL 4393163, at *11 (S.D.N.Y. July 15, 2015) ("[The plaintiff] undisputedly experienced an adverse employment action when he was denied promotion."). And, El Chaar's testimony that Bertolami told him, "You

complained to OEO, and we needed a cooling period," establishes a causal connection between the adverse action and his alleged retaliation. *See id.* at 12 (holding that the supervisor's reference to the plaintiff's lawsuits in explaining why he did not get an interview "bespoke that [the plaintiff's lawsuits] had played some role in the [employer's] reasons for not promoting him").

The burden then shifts to Defendant to articulate a legitimate, nonretaliatory basis for the failure to appoint El Chaar as the interim chair. *Early*, 603 F. Supp. 2d at 573. Here, Defendant has met its burden. Interim chairs were "routinely" appointed at NYU Dentistry, and these chairs are typically "experienced administrator[s] . . . [with] no intention of applying for the permanent position." Def. 56.1 ¶¶ 116–17. An interim chair's role is to "evaluate the department for the Dean, make improvements, resolve conflicts and rebuild." *Id.* ¶ 116. An interim chair had previously been appointed to oversee the Department from 2010 to 2012 for these very reasons. *Id.* ¶¶ 32–35; Bertolami Tr. at 59:6–15.

El Chaar does not dispute that, when Sigurdsson was appointed, the Department was "fractious" and faced issues with "(1) patient complaints, (2) concerns with the rigorousness of the requirements for the predoctoral program, and (3) differences among the faculty as to the vision for the Department, which created operational issues." *Id.* ¶ 126. Bertolami installed Sigurdsson to "improve the situation in the Department to maximize the number of excellent candidates who would apply for the permanent position." *Id.* ¶ 129. Given the problems afflicting the Department, Sigurdsson's appointment follows NYU Dentistry's established pattern for appointing interim chairs from outside the department. *See* Def. 56.1 ¶¶ 117–19; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (holding that "consistency" supports the "proffered nondiscriminatory reason").

The burden shifts back to El Chaar to provide "facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that the legitimate reasons offered . . . were a pretext for retaliation." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) (summary order)

(cleaned up).  Under § 1981, a plaintiff alleging retaliation "must show that retaliation was a 'but-for' cause of the adverse action," in other words, "that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered" reasons. *Id.*  To show that the reason for his employer's refusal to promote him was pretextual, the plaintiff must show by a preponderance of the evidence that the employer's justifications "were not its true reasons, but were a pretext for discrimination [or retaliation]." *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125 n.11 (2d Cir. 2008) (citation omitted).

El Chaar has admitted that the Department was fractious.  Def. 56.1 ¶ 126; *see Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 689 (S.D.N.Y. 2020) (faulting the plaintiff for not showing that the defendant's proffered reason was false).  And, he does not suggest that "his credentials were so superior . . . that no reasonable person could have chosen [Sigurdsson] over" him. *Gonzalez*, 442 F. Supp. 3d at 690.

El Chaar again points to his testimony about Bertolami saying—near the time of Sigurdsson's appointment—that the Department needed a cooling-off period due to El Chaar's OEO complaint. Pl. 56.1 ¶ 42.  At the summary-judgment stage, the Court is bound to accept El Chaar's version of his conversation with Bertolami, and, standing alone, it could suggest that the "legitimate reasons offered by the defendant[] were not [its] true reasons." *Cardwell*, 2023 WL 2049800, at *36.

But, the question at summary judgment is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010).  Here, this one comment is insufficient to meet El Chaar's burden

to show but-for causation, given the admitted problems in the Department and the common practice of appointing interim chairs. *Id.* at 726–27 (holding that an "offhand" remark offers a "scintilla of evidence" in support of pretext but, without "further support in the record," is not sufficient for a jury to find that a supervisor's comment was made with a discriminatory motive). Moreover, other evidence in the record weakens the inference that this comment demonstrates a retaliatory motive. Bertolami said in the surreptitiously recorded Zoom meeting that "[o]ther people" needed a cooling-off period, not El Chaar. ECF No. 44-19 at 14:1–15:10; *see also* Bertolami Tr. at 116:13–23. Indeed, Bertolami said that he appointed an interim in part to help El Chaar's chances of becoming the permanent chair, ECF No. 44-19 at 12:22–13:1, 14:1–6, and El Chaar does not dispute that Bertolami was ready to give him the job in 2020 if Sigurdsson had decided to move on before a permanent chair could be appointed, Def. 56.1 ¶ 153. And, although Bertolami referenced the OEO complaint, he did not suggest that El Chaar did anything wrong by filing it. *Cf. Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 1051, 2020 WL 1528101, at *9 (S.D.N.Y. Mar. 31, 2020) (denying summary judgment when supervisor told the plaintiff that he was a "troublemaker" and asked him if there was anything he regretted).

El Chaar also claims that Bertolami denied him the position because Bertolami understood the OEO Report to be holding El Chaar partially responsible for the Department's "fractious" state. Pl. Opp. at 16. Retaliation requires the filing of a complaint to be the "but-for" cause of the adverse action. Even if Bertolami interpreted the OEO Report as holding El Chaar responsible, *see* ECF No. 44-3 at 2, that alone does not demonstrate a retaliatory motive unless El Chaar can show that Bertolami held this interpretation because El Chaar filed the OEO complaint. El Chaar has offered no such evidence.

Accordingly, El Chaar has not shown that retaliation was the but-for cause of the decision not to appoint him as interim chair, dooming his retaliation claim as to this discrete act under § 1981.

C.  Failure to Appoint as Permanent Chair

El Chaar next contends that the failure to appoint him as the permanent chair in 2021 was both discriminatory and retaliatory.  Pl. Opp. at 16–18, 26–27.

1.  Discrimination

The Court first examines whether El Chaar has made a prima facie case of discrimination. The first three prongs are not contested: El Chaar is a member of a protected class, was qualified for the position of permanent chair, and was denied the position.

The fourth prong is whether the denial "occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150.  El Chaar argues that there is an inference of discrimination because Bertolami used a survey during the interview process.  Pl. Opp. at 26–27.  El Chaar points to Bertolami's statement that determining "whether or not the faculty in [p]eriodontology would be willing to be led by [] El Chaar . . . is what motivated the survey."  Pl. 56.1 ¶ 81.  And, Bertolami allegedly told El Chaar, "[B]ased on the survey, I cannot give you the position."  Pl. 56.1 ¶ 84.  According to El Chaar, Bertolami's use of and deference to the survey allowed "the same faculty who had tormented him for years based on his race and national origin" to "prevent [] El Chaar from being promoted to [c]hair."  Pl. Opp. at 26–27.

Courts in this Circuit have recognized that a decisionmaker who is not biased can be a "conduit of the subordinates' improper motives," if he "'rubber stamps' the recommendation of [biased] subordinates."  *Fullard v. City of New York*, 274 F. Supp. 2d 347, 357 (S.D.N.Y. 2003) (citations and quotation marks omitted)).  This form of liability is called "cat's paw liability," *id.*, or a "poisoning the well" theory, *Balk v. N.Y. Inst. of Tech.*, 683 F. App'x 89, 94 (2d Cir. 2017); *see id.* ("If [the] source of input for [an] employment decision was in fact polluted by racial bias, that might be enough to poison the well of the manager's decision even if he were wholly innocent of such a bias on his part." (cleaned up and emphasis omitted)).

But, for Bertolami to be a "conduit," El Chaar must demonstrate that the survey responses "themselves were the product of discriminatory or retaliatory intent." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016).  He has not.  The survey responses do not, on their face, indicate bias.  *See* ECF No. 38-49.  It is true that evidence of bias is rarely stated directly.  *See Gallo v. Prudential Res. Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  But, El Chaar has not adduced additional evidence that the survey responses were motivated by discriminatory attitudes about his race or national origin.  El Chaar merely claims that Tang, Wayne Kye, and Roya Mohajer—three faculty members, none of whom were discussed in the OEO Report—started a campaign against him in response to the survey, Def. 56.1 ¶ 176, but does not offer evidence that the campaign had something to do with his race or national origin.[8]

Moreover, an employer is not liable "simply because it acts on information provided by a biased co-worker"; rather, the employer "adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outside role in its own employment decision." *Vasquez*, 835 F.3d at 275 (emphasis in original).  El Chaar has not demonstrated that Bertolami acted negligently in considering the survey responses: El Chaar told Bertolami in the Zoom meeting that El Chaar's relationship with the Department was "positive" and that he had made peace with "the main instigator."  *See* ECF No. 44-19 at 27:10–23, 29:19–23.  Moreover, as stated above, the survey responses did not, on their face, indicate bias so as to arouse Bertolami's suspicion of unlawful conduct.

Even if the Court were to assume that El Chaar could make out a prima facie case, Defendant has offered legitimate, non-discriminatory reasons both for using the survey and for denying El

---

[8] Indeed, El Chaar admits that he and Tang had continuing interpersonal conflicts that prompted his July 20, 2019 letter to Sigurdsson seeking to have her removed from the Department, and does not claim that these conflicts were motivated by his race or nationality.  *See* Def. 56.1 ¶¶ 149–52.

Chaar's promotion, and El Chaar cannot show that these reasons were pretextual.  *Cardwell*, 2023 WL 2049800, at *20.

As for the survey, Defendant states that Bertolami regularly elicited feedback from department faculty before appointing a chair to lead them.  Def. 56.1 ¶¶ 172, 174, 178.  El Chaar does not dispute that Bertolami sought "a consensus builder; and someone very good at interpersonal relationships."  *Id.* ¶ 169.  A survey of the Department would help Bertolami assess those qualities, similar to the listening tours that Bertolami had conducted for other NYU Dentistry chairs.  *Id.* ¶ 179. Bertolami also said that the survey was created in response to El Chaar's interview statement that he would fire four or five colleagues if he were to become the permanent chair, which raised doubts about El Chaar's "capacity for leadership" and the veracity of his claim that his relationship with the faculty was "positive," as he had stated in the Zoom meeting.  Bertolami Tr. at 163:16–25.  Assessing whether a person has "the judgment needed for the role" is a legitimate, non-discriminatory motive. *Fleming*, 371 F. App'x at 117.

El Chaar argues that these reasons were pretextual because Bertolami knew that the surveyed persons held discriminatory beliefs.  But, El Chaar told Bertolami that his relationship with the Department was "positive."  Of the three people named in the OEO Report, El Chaar's relationship with Bloom remained poor, but Loomer—the former chair—had departed, and El Chaar said that he made peace with Warren.  The survey was sent to 77 faculty members, and Bertolami's decision to use a survey, even if he knew that one or two people may have negative or even discriminatory beliefs about El Chaar, does not demonstrate that he was motivated by discrimination.  *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("We are interested in what *motivated* the employer." (citation and quotations marks omitted)).

El Chaar also contends that this was the first time that a written survey had been used to appoint a Department chair.  Pl. 56.1 ¶ 78.  "[D]epartures from procedural regularity . . . can raise a

question as to the good faith of the process where the departure may reasonably affect the decision." *Weinstock*, 224 F.3d at 45 (cleaned up and emphasis omitted).  But, NYU Dentistry had used written surveys before for other positions, Def. 56.1 ¶ 180, and Bertolami conducted listening tours for other high-level positions, *id.* ¶ 179.  Moreover, El Chaar concedes that the survey was written because of COVID-19 pandemic restrictions.  *Id.* ¶ 174.

As for the denial of the permanent chair position, Defendant claims that Palomo was more qualified than El Chaar based on Bertolami's criteria.  *See* Def. 56.1 ¶ 169.  El Chaar does not dispute that Bertolami wanted to appoint a "candidate with an outstanding academic record; a good teacher, clinically and academically; someone with credibility; a consensus builder; and someone very good at interpersonal relationships with a preference for a tenured full professor."  *Id.*  An employer may base its decision on such subjective criteria, as long as it does not rely on a "vague or conclusory averment[] of good faith . . . that would not frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."  *Tucker v. N.Y. City*, 376 F. App'x 100, 102 (2d Cir. 2010) (citations and quotation marks omitted); *see Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e) ("An employer is entitled to arrive at a subject evaluation of a candidate's suitability for a position.").  Palomo was a tenured professor and a member of multiple professional organizations, which "suggested strong interpersonal skills, academic record, reputation and leadership."  *Id.* ¶ 182.  By contrast, although El Chaar was qualified, he was not on a tenure track, had been rejected for promotion, and called people within the Department "enemies."  *Id.* ¶ 183.  El Chaar does not dispute that Bertolami's executive committee ranked Palomo first and El Chaar second.  *Id.* ¶ 181.  The Court concludes that Defendant has met its burden to proffer legitimate, nondiscriminatory reasons for choosing Palomo.

The burden, therefore, shifts to El Chaar to demonstrate that these reasons were pretextual. To show that the reason for his employer's refusal to promote him was pretextual, the plaintiff must show by a preponderance of the evidence that the employer's justifications "were not its true reasons, but were a pretext for discrimination." *Richardson*, 532 F.3d at 125 n.11 (citation omitted).  El Chaar concedes that the reasons offered by Defendant in ranking him second were accurate: he was not on a tenure track, had been denied promotion, and had called people within the Department "enemies," while Palomo had both tenure and membership in professional organizations, which "suggested strong interpersonal skills, academic record, reputation and leadership."  Def. 56.1 ¶¶ 181–83.

He argues, however, that these reasons understate the importance of the survey as evidenced by Bertolami allegedly stating that he could not give El Chaar the position "based on the survey."  Pl. Opp. at 16–17.  But, Bertolami's comment does not demonstrate that the reasons offered by Defendant hid discrimination.  The survey was an explicit part of Bertolami's rationale: he testified that El Chaar "was our second choice" prior to the survey, and that if, in the survey, "the faculty had strongly favored [El Chaar], we certainly would have reconsidered" the decision to choose Palomo. Bertolami Tr. 156:12–15.  And, as discussed above, El Chaar has neither shown that the survey responses were infected with racial discrimination nor that Bertolami acted negligently in considering them.  Therefore, Bertolami's consideration of the survey does not render his reasons for choosing Palomo a pretext for racial discrimination.

Second, El Chaar disputes Defendant's reliance on Palomo's tenure, which he says was not a requirement for the position.  Pl. Opp. at 16.  But, Defendant does not claim that tenure was a requirement; indeed, El Chaar, despite not having tenure, would have been offered the position had Palomo declined.  *Id.* ¶ 186.  Tenure is plausibly relevant to whether the candidate had an "outstanding academic record," *id.* ¶ 169, and Bertolami's consideration of Palomo's tenure does not undermine the proffered rationale.  *See Fleming*, 371 F. App'x at 118 ("Only where an employer's

22

business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.").

Accordingly, El Chaar has not demonstrated that Defendant discriminated against him on the basis of race or national origin in conducting the survey and selecting Palomo.

### 2. Retaliation

El Chaar argues that he was denied the permanent chair position in retaliation for his OEO complaint.  The causal inference in his prima facie case is weaker, as over three years had passed between his OEO complaint and Palomo's selection as chair.  *See Doe v. City of New York*, No. 22 Civ. 6898, 2023 WL 4624692, at *3 (S.D.N.Y. July 19, 2023).  But, even if the Court were to assume that El Chaar could make a prima facie case, his claim fails for the same reasons as his discrimination claim.  Defendant has offered a legitimate, non-retaliatory rationale for selecting Palomo, and El Chaar has not demonstrated that its reasons were pretextual.

Accordingly, El Chaar has not shown that retaliation played a role in the denial of the permanent chair appointment, so his retaliation claim fails.

### III.   Constructive Discharge

Under federal law, "[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003).  "Such a claim requires the employee to show both [1] that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and [2] that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign."  *Pompey-Primus v. Success Acad. Charter Schs., Inc.*, No. 21 Civ. 3981, 2022 WL 504541, at *4 (S.D.N.Y. Feb. 17, 2022) (quoting *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017)).  The inquiry is objective.  *Pa. State Police v. Suders*, 542

U.S. 129, 141 (2004).  The standard is "demanding."  *Pollock v. Shea*, 568 F. Supp. 3d 500, 513 (S.D.N.Y. 2021).  A "reduction in responsibilities" is not sufficient to make out such a claim.  *Tulino v. City of N.Y.*, 813 F. App'x 725, 727 (2d Cir. 2020) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004)).  Nor is unfair criticism, *Catania v. NYU Langone Health Sys.*, No. 22 Civ. 4362, 2022 WL 17539121, at 4 (S.D.N.Y. Dec. 5, 2022), or the "denial of promotion by itself."  *Spires v. MetLife Grp., Inc.*, No. 18 Civ. 4464, 2019 WL 4464393, at *10 (S.D.N.Y. Sept. 18, 2019).

El Chaar's constructive-discharge claim is insufficient as a matter of law.  El Chaar does not demonstrate that Bertolami or any other supervisor deliberately sought to create an intolerable work environment; indeed, Bertolami sought to have El Chaar continue in his position as program director, which carried with it significant managerial responsibilities.  Def. 56.1 ¶ 192; *see Pollock*, 568 F. Supp. 3d 514 (noting that supervisor "indicating that he understood [plaintiff]'s frustration and hoped that she would remain" with the employer cut against a constructive-discharge finding).  El Chaar also claims that his complaints of discrimination and retaliation were not taken seriously, but in addition to creating the OEO Report, Defendant ensured that no persons on the search committee for chair were faculty "who had a history of conflict with Plaintiff."  Def. 56.1 ¶ 160.  El Chaar's threats to resign if he were not made the chair, *id.* ¶¶ 189–90, state a "dissatisfaction with job assignments," which is "simply insufficient to establish the sort of intolerable working conditions necessary to a constructive discharge claim."  *Antrobus v. N.Y.C. Health & Hosps. Corp.*, No. 19 Civ. 7449, 2021 WL 964438, at *15 & n.14 (S.D.N.Y. Mar. 15, 2021).

IV.    State Law

Finally, El Chaar brings claims under the NYSHRL and the NYCHRL.  Compl. ¶¶ 64–89.  Having granted summary judgment to Defendant on El Chaar's federal claims, the Court declines to exercise supplemental jurisdiction over his state-law claims.  *See* 28 U.S.C. § 1367(c)(3); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("[W]here the federal claims are dismissed before trial,

the state claims should be dismissed as well.").  Accordingly, those claims are DISMISSED without prejudice to renewal in state court.

<b>CONCLUSION</b>

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to El Chaar's federal claims, and El Chaar's state claims are DISMISSED without prejudice to renewal in state court.  The Clerk of Court is directed to enter judgment for Defendant consistent with this order, terminate the motion at ECF No. 36, and close the case.

SO ORDERED.

Dated: March 28, 2024
       New York, New York

_____
          ANALISA TORRES
     United States District Judge