USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/26/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. EDGARD EL CHAAR,

Plaintiff,

-against-

NEW YORK UNIVERSITY COLLEGE OF DENTISTRY,

Defendant.

22 Civ. 856 (AT)

**MEMORANDUM**
**OPINION**

ANALISA TORRES, District Judge:

Plaintiff, Edgard El Chaar, alleges that Defendant, the New York University College of Dentistry ("NYUCD"), subjected him to a hostile work environment, discriminated and retaliated against him, and constructively discharged him because of his race and national origin. *See generally* Compl., ECF No. 2. El Chaar asserts claims for discrimination and retaliation under (1) 42 U.S.C. § 1981; (2) the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 296 *et seq.*; and (3) the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8–107. *See* Compl. at ¶¶ 64–97. By order dated March 28, 2024 (the "SJ Order"), the Court granted NYUCD's motion for summary judgment as to El Chaar's federal claims and dismissed his state claims without prejudice to renewal in state court. *See* SJ Order at 25, ECF No. 53. El Chaar appealed the SJ Order. *See* Notice of Appeal, ECF No. 55.

The United States Court of Appeals for the Second Circuit affirmed in part and vacated in part the SJ Order. *See* Court of Appeals Summary Order ("Mandate"), ECF No. 59. The Second Circuit affirmed the Court's grant of summary judgment in favor of NYUCD on El Chaar's federal discrimination claim with respect to NYUCD's decision not to appoint him as permanent chair of the Department of Periodontology and Implant Dentistry. *See* Mandate at 8, 13; Compl. ¶¶ 90–93. The Second Circuit vacated the Court's grant of summary judgment in favor of NYUCD on El Chaar's

federal retaliation claim with respect to NYUCD's decision not to appoint him as interim chair. *See* Mandate at 10, 13.

Given the reinstatement of a portion of El Chaar's federal retaliation claim, the Court determined it would "exercise supplemental jurisdiction over Plaintiff's state and city law claims and decide them on the existing summary judgment record." *See* ECF No. 58. On September 21, 2026, the Court issued an order granting in part and denying in part NYUCD's summary judgment motion. *See* ECF No. 60. As explained in this memorandum opinion, NYUCD's motion for summary judgment is DENIED with respect to El Chaar's NYCHRL claim of retaliation based on NYUCD's decision not to appoint him as interim chair. NYUCD's motion for summary judgment is GRANTED as to the rest of Plaintiff's NYSHRL and NYCHRL claims.

**BACKGROUND**[1]

NYUCD is led by a dean and an informal executive committee. Def. 56.1 ¶¶ 6–9, ECF No. 50-2. Since 2007, Charles Bertolami has served as dean, and the eleven dentistry departments, including the chairs of each department, report to him. *Id.* ¶¶ 5–6, 8. Bertolami is the ultimate decision-maker in appointing department chairs. Pl. 56.1 ¶ 86, ECF No. 51. The second-largest department, with over 120 faculty members, is the Department of Periodontology and Implant Dentistry (the "Department"). Def. 56.1 ¶¶ 28–29.

In 1993, El Chaar graduated from dental school in Lebanon and moved to the United States to attend a one-year international program at NYUCD. *Id.* ¶ 1. After he completed his training, El Chaar was employed at NYUCD for almost 26 years—as a part-time faculty member between 1995

[1] The Court assumes familiarity with the facts as set for in the SJ Order and the Mandate and only repeats them here as relevant to NYUCD's motion on El Chaar's NYSHRL and NYCHRL claims. The facts in this section are taken from the parties' Rule 56.1 statements, responses, and declarations, unless otherwise noted. Disputed facts are so noted. Citations to a paragraph in a Rule 56.1 statement include the opposing party's response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted). On a motion for summary judgment, the facts must be read in the light most favorable to the non-moving party. *Id.* at 69.

and 2012, and as a full-time faculty member and program director of the postgraduate periodontology program from 2013 to 2021. *Id.* ¶¶ 3–4.

When El Chaar worked as a part-time faculty member, faculty members made "sporadic" comments to him about his ethnicity and race: El Chaar alleges that between 1994 and 1997, a part-time faculty member called him a "camel-jockey," and around 2001, the Department's former program director called him a "dirty Arab." *Id.* ¶¶ 42–43, 49; Pl. 56.1 ¶ 1.

In 2012, El Chaar briefly left the Department to become a program director at Lutheran Medical Center but returned in August 2013 as the Department's program director of postdoctoral periodontology. Def. 56.1 ¶¶ 53–54, 58. In May 2014, Peter Loomer, then the Department chair, recommended withholding El Chaar's raise for poor performance, citing El Chaar's failure to hold required faculty meetings, his "authoritarian attitude," and complaints from residents and faculty about his "unprofessional behavior." *Id.* ¶ 80; *see* ECF No. 38-18 (email dated May 19, 2014). And, in November 2016, another professor complained that El Chaar "had treated her in an unprofessional, aggressive, and hostile manner," and had subsequently cut her out of Department business. Def. 56.1 ¶¶ 89–90, *see* ECF No. 38-29. However, the associate dean for graduate and postgraduate programs testified that El Chaar improved the Department's postgraduate program during his tenure as program director. Pl. 56.1 ¶ 23.

In August 2017, El Chaar filed a complaint (the "OEO Complaint") with NYUCD's Office of Equal Opportunity ("OEO"), charging Loomer and two other professors, Roger Warren and Mitchell Bloom, with discrimination and retaliation. Def. 56.1 ¶ 102. Following interviews with El Chaar, Loomer, Warren, Bloom, and witnesses, on February 7, 2018, the OEO issued a report (the "OEO Report"), which concluded that "none of the individual respondents had engaged in conduct that by itself would rise to the level of a policy violation." *Id.* ¶¶ 107–08; *see* OEO Report, ECF No. 38-36. However, OEO found that certain allegations (the "Report Acts"), including that Loomer called El

Chaar "anti-Semitic" and that Warren called him a "foreigner," were corroborated by at least one witness. OEO Report at 20–21. The Report Acts gave OEO "pause *[sic]* for concern" and concluded that "there is evidence to support [El Chaar]'s collective allegations of a hostile work environment." *Id.* at 21. After conferring with the authors of the OEO Report, Bertolami required NYUCD faculty to attend a two-part training program "related to non-discrimination/anti-harassment." Def. 56.1 ¶¶ 110–12.

In the fall of 2018, Bertolami decided to appoint an interim chair for the Department after Loomer announced his resignation and could not stay during the search for a permanent replacement. *Id.* ¶¶ 121–23. El Chaar spoke with Bertolami about the interim position, and according to El Chaar, Bertolami told him:

> "[W]e are not appointing [you] the chair because of your complaint to OEO. We need to have a chilling period. And you should have been the acting chair, but because of your complaint, we can't—I can't put you there. So we brought [Asgeir] Sigurdsson to calm things down."
>
> El Chaar Tr. at 147:14–148:14, ECF No. 38-3.

Bertolami testified that he did not recall this conversation but remembered his feeling that "everyone would benefit from a cooling-off period." Bertolami Tr. at 116:13–23, ECF No. 38-4.

In late November 2018, Bertolami appointed Sigurdsson as interim chair. Def. 56.1 ¶¶ 129. According to Bertolami, Sigurdsson was someone "who[m] everyone liked and was an excellent administrator, who[m] Dr. El Chaar [also] liked." Bertolami Tr. at 116:13–23. Bertolami further testified that the OEO Complaint played no role in Bertolami's decision to appoint Sigurdsson; that the appointment of an interim chair was a "routine way of operating academically, particularly when the [chair] is leaving"; and that the decision not to appoint El Chaar would not be an "impediment" to his future eligibility for the permanent chair position. *Id.* at 117:10–11, 121:8–12, 122:3–9. El Chaar does not dispute that when Loomer resigned, the Department was "fractious" and faced issues with

"(1) patient complaints, (2) concerns with the rigorousness of the requirements for the predoctoral program, and (3) differences among the faculty as to the vision for the Department, which created operational issues." Def. 56.1 ¶ 126. Bertolami hoped that Sigurdsson would "improve the situation . . . to maximize the number of excellent candidates who would apply for the permanent position." *Id.* ¶ 129.

By letters dated July 16 and 20, 2019, El Chaar requested that then-interim chair Sigurdsson remove two Department faculty members, Vera Tang and Robert Horowitz. *See* ECF No. 44-6 (July 16, 2019 letter); ECF No. 38-41 (July 20, 2019 letter). El Chaar's request stemmed from hostility he felt from Tang and Horowitz, following negative public comments Horowitz made about El Chaar at an October 2018 conference sponsored by an organization of which Tang was the incoming president. Def. 56.1 ¶¶ 142–51. El Chaar demanded an apology from Tang which she refused to give. *Id.* ¶ 148. El Chaar also stated in the letters that Warren and Bloom, whom he named in the OEO Complaint, called him anti-Semitic, and that "[t]here continues to be a campaign waged against [him] on the basis of [his] ethnicity and religion." *See* ECF Nos. 44-6, 38-41.

On June 27, 2020, Bertolami met with El Chaar via Zoom. *See* ECF No. 44-19 (Zoom transcript). During the meeting, Bertolami stated that El Chaar would have been a "logical choice" as interim chair, but that Bertolami decided not to appoint El Chaar for "political reasons," including that it was his "opinion at the time that what would benefit [El Chaar] would be a period of cooling off. Not [El Chaar] cooling off. . . . Other people cooling off." *Id.* at 14:1–6, 14:14–15:10. Bertolami believed that if a search opened for a permanent chair position, El Chaar "would be a strong candidate and would likely be the final choice for chair." Def. 56.1 ¶ 157.

After the Zoom meeting, Bertolami began the search for a permanent chair. *Id.* ¶ 158. The search committee did not include "faculty who had a history of conflict with" El Chaar. *Id.* ¶¶ 159–60. El Chaar does not allege that any members of the search committee were biased against him. *Id.*

¶ 165. El Chaar applied, and the search committee recommended him as one of four finalists. *Id.* ¶ 167. Although Bertolami had the ultimate say in selecting the permanent chair, he consulted his executive committee. *See* Pl. 56.1 ¶ 86; Def. 56.1 ¶ 185. Bertolami sought "a candidate with an outstanding academic record; a good teacher, clinically and academically; someone with credibility; a consensus builder; and someone very good at interpersonal relationships with a preference for a tenured full professor." Def. 56.1 ¶ 169. The four finalists, including El Chaar, interviewed with each member of the executive committee and gave a seminar via Zoom to the NYUCD faculty. *Id.* ¶¶ 170–71. During his interview with Bertolami, El Chaar said that upon becoming chair he would fire four or five members of the Department, which concerned Bertolami. Pl. 56.1 ¶ 81. El Chaar also said that he would resign if he did not receive the promotion. Def. 56.1 ¶ 190. El Chaar had previously made a similar statement to Sigurdsson. *Id.* ¶ 189.

Bertolami then circulated a survey to the NYUCD faculty to evaluate the seminars and each "candidate's suitability to be chair." *Id.* ¶ 172. Bertolami "regularly solicited the faculty's feedback when selecting a chair," *id.* ¶ 178, and he decided to use a written survey because the pandemic made it difficult for the faculty to gather in person, *id.* ¶ 174. Bertolami was particularly interested in "whether or not the faculty in [the Department] would be willing to be led by [] El Chaar" in light of El Chaar's comments during the interviews. Pl. 56.1 ¶ 81. The survey was sent to seventy-seven faculty members and completed by approximately forty. Def. 56.1 ¶ 175. El Chaar testified that, in response to the survey, Tang, Wayne Kye, and Roya Mohajer—three faculty members, none of whom were mentioned in the OEO Report—started a campaign to promote other candidates over El Chaar. *Id.* ¶ 176. El Chaar received the most first-place and last-place rankings in the survey. *Id.* ¶ 177. In the narrative fields, some faculty "thought very highly of" El Chaar, and others wrote that he was "vindictive," "divisive," and "narcissistic," and that he "bullies" faculty and residents. *Id.*; *see* ECF No. 38-49.

On May 13, 2021, Bertolami offered the position of permanent chair to Leena Palomo, an external candidate, who accepted. Def. 56.1 ¶¶ 185, 187. Palomo was a tenured professor at Case Western Reserve University, and her professional memberships "suggested strong interpersonal skills, academic record, reputation and leadership." *Id.* ¶ 182; *see* Bertolami Tr. at 139:15–22. Bertolami testified that El Chaar was passed over because he was not on tenure track, had previously been rejected for promotion, and used terms like "friends" and "enemies" to describe Department faculty. Def. 56.1 ¶ 183. Bertolami stated that El Chaar was still a "very good second choice" and would have been appointed as permanent chair if Palomo turned down the job. *Id.* ¶¶ 183, 186. El Chaar does not dispute that Bertolami's executive committee ranked Palomo first and El Chaar second. *Id.* ¶ 181. Bertolami testified that El Chaar "was [the executive committee's] second choice" prior to the survey and that, if in the survey "the faculty had strongly favored [El Chaar], [the executive committee] certainly would have reconsidered" the decision to choose Palomo. Bertolami Tr. 156:12–15. El Chaar alleges that, in a phone call on May 13, 2021, Bertolami said, "[T]he survey came back negative against [you]. And based on the survey, I cannot give you the position." Pl. 56.1 ¶ 84; *see* Def. 56.1 ¶ 192. Bertolami asked El Chaar to stay on as program director, but El Chaar resigned later that day. Def. 56.1 ¶¶ 192, 195.

El Chaar contends that he was (1) subjected to a hostile work environment; (2) denied promotion to the position of interim chair because of the OEO Complaint; (3) denied promotion to the position of permanent chair both because of the survey—which he claims was tainted with racial discrimination—and the OEO Complaint; and (4) constructively discharged. *See generally* Opp., ECF No. 45.[2]

---

[2] As stated in the SJ Order, because El Chaar did not respond in his opposition papers to NYUCD's motion for summary judgment on his claims relating to NYUCD's denial of his April 29, 2019 application to be promoted from clinical associate professor to clinical professor, the Court deems this theory abandoned. *See* SJ Order at 8 n.4.

## LEGAL STANDARD

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006). The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in h[is] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

## DISCUSSION

### I. NYSHRL Claims

With the exception of El Chaar's federal claims, which were already addressed in the SJ Order, his opposition papers only address his NYCHRL causes of action. S*ee* Opp. at 13, 18–20, 23–28; *see also* Reply at 3–4 n.5. "In the case of a counseled party," like El Chaar, "a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). Because El Chaar has not addressed his NYSHRL claims, the Court grants NYUCD summary judgment on

those causes of action. *See, e.g.*, *Logan v. Saks & Co., LLC*, No. 18 Civ. 9023, 2020 WL 5768322, at *7 n.4 (S.D.N.Y. Sep. 28, 2020) ("To the extent [p]laintiff's complaint asserts a claim for NYSHRL . . . retaliation . . . , his failure to contest [d]efendant's motion for summary judgment on that issue constitutes abandonment of it.").

II. NYCHRL Claims

A. Less Favorable Treatment (N.Y.C. Admin. Code § 8–107(1)(a))

Under the NYCHRL, both discrimination and hostile work environment claims are subject to the same standard: a plaintiff "need only show differential treatment—that [he] is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *see also Johnson v. Strive East Harlem Employment Group*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) ("[U]nder the NYCHRL, there are not separate standards for discrimination and harassment claims. . . . Instead, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based on a protected characteristic." (internal quotation marks and citation omitted)); N.Y.C. Admin. Code § 8–107(1)(a). Federal civil rights statutes serve as a "floor below which the [NYCHRL] cannot fall," *Mihalik*, 715 F.3d at 110 (emphasis and citation omitted), so district courts must construe the NYCHRL's "provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Id.* at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)); *see Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 13 (2d Cir. 2013) (summary order) (explaining that the NYCHRL is "intended to provide a remedy reaching beyond those provided by the counterpart federal civil rights laws").

Even so, the NYCHRL is not a "general civility code." *Mihalik*, 715 F.3d at 110 (citation omitted). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.* Summary judgment for the defendant is, therefore, "appropriate if 'the

record establishes as a matter of law' that discrimination . . . 'played no role' in the defendant's actions." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015) (quoting *Mihalik*, 715 F.3d at 110 n. 8).

El Chaar offers multiple theories to support his claim that NYUCD subjected him to "different terms, conditions and privileges of employment" based on his race and national origin. *Johnson*, 990 F. Supp. 2d at 445. The Court considers each in turn.

1. Hostile Work Environment

First, El Chaar argues he was subjected to "racial harassment" in violation of the NYCHRL "[t]hroughout his [e]mployment at NYU[CD]." *See* Opp. at 3–4. NYUCD contends that this claim is barred by the statute of limitations and is otherwise legally insufficient. *See* Mem. at 6–12.

As a threshold matter, the continuing violation doctrine does not apply. The Court, therefore, may only consider conduct after February 20, 2018.[3] "Under the NYCHRL, if 'specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice,' 'a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'" *Hoffmann v. Mary Giuliani Catering & Events, Inc.*, 24 Civ. 5910, 2025 WL 1616859, at *3 (S.D.N.Y. June 6, 2025) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)). But the continuing violation doctrine does not apply if the employer takes an "intervening action" to remedy the allegedly discriminatory conduct. *Cooke v. Consol. Edison Co. of N.Y., Inc.*, No. 24 Civ. 536, 2026 WL 691153, at *14 (S.D.N.Y. Feb. 26, 2026) (internal quotation marks and citation omitted), *report and recommendation adopted*, No. 24

[3] The statute of limitations for claims under the NYCHRL is three years. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). Here, El Chaar filed this action in state court on October 6, 2021. *See* ECF No. 2. Because New York State Executive Order 202.8 and subsequent extensions tolled the NYCHRL's statute of limitations during the COVID pandemic, 228 days are added to the statute of limitations for El Chaar's NYCHRL claims. *See Foy v. State of New York*, 71 Misc. 3d 605, 607–08 (N.Y. Ct. Cl. 2021) (citing 9 N.Y. Comp. Codes R. & Regs. tit. 9, § 8.202.8).

Civ. 536, 2026 WL 738468 (S.D.N.Y. Mar. 16, 2026). Because NYUCD took intervening action to remedy the Report Acts by implementing the training recommended by the OEO, there was no continuing violation. *See* Def. 56.1 ¶¶ 110–12.[4] In addition, even under the NYCHRL's more liberal standard, "at least one of the [allegedly hostile] acts [must have] occurred within the limitations period." *Isbell v. City of New York*, 316 F. Supp. 3d 571, 585 (S.D.N.Y. 2018); *see also Cooke*, 2026 WL 691153, at *14 (indicating that continuing violation doctrine would apply under the NYCHRL only if "one or more . . . incidents . . . fall within the limitations period"). As discussed below, El Chaar fails to adduce admissible evidence of racial hostility during the limitations period, and the continuing violation doctrine cannot save claims premised on entirely time-barred conduct.

With respect to allegations of racial hostility after February 20, 2018, El Chaar claims that certain NYUCD faculty members accused him of being anti-Semitic because of his national origin.[5] However, this claim is premised on hearsay statements, *i.e.*, text messages from and conversations with other individuals who informed El Chaar of the accusations. *See* Opp. at 26; ECF No. 44-16 at 5 (text message to El Chaar stating a colleague was repeating the rumor that El Chaar was an anti-Semite); Pl. 56.1 ¶ 61 (noting that Dr. Laureen Langer said another faculty member was calling El Chaar anti-Semitic). Inadmissible hearsay cannot defeat a motion for summary judgment, *see Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020), and the alleged accusations do not fall within a hearsay exception. In some cases, El Chaar also fails to identify when the alleged anti-Semitism accusations occurred, preventing the Court from determining whether the conduct occurred within the limitations period. For example, although El Chaar's July

[4] El Chaar argues that NYUCD's training did not remedy the Report Acts because the training was "generic" and "not tailored to the specific racist harassment [he] experienced," Opp. at 24, but he offers no evidence that supports this contention, nor does he otherwise show how the training inadequately addressed the Report Acts. *See Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (a party opposing summary judgment cannot rely on conclusory allegations).

[5] El Chaar also identifies the use of the faculty survey during the permanent chair hiring process as contributing to a hostile work environment. *See* Opp. at 26–27. The Court addresses whether the use of the faculty survey constituted less favorable treatment in violation of the NYCHRL separately below.

16 and July 20, 2019 letters to Sigurdsson state that Warren and Bloom called El Chaar anti-Semitic, he did not indicate in those letters, and does not indicate now, when this incident occurred. *See* Def. 56.1 ¶ 151; Pl. 56.1 ¶¶ 52–53; ECF No. 44-6; ECF No. 38-41.

Without admissible evidence of harassment occurring within the limitations period, there is no basis to conclude that El Chaar was "treated less well because of a discriminatory intent" with respect to the alleged hostile work environment. *Mihalik*, 715 F.3d at 110 (cleaned up).

2. Failure to Appoint to Permanent Chair Position

El Chaar further argues that he was treated unfavorably in violation of the NYCHRL when "Bertolami discriminated against [him] by subjecting him to a survey of the same faculty who had tormented him for years based on his race and national origin" during the vetting of candidates for the permanent chair role. Opp. at 26–27. Although the Court concluded, and the Second Circuit upheld, that El Chaar had not shown that his denial of the permanent chair position gave rise to an inference of discrimination under federal law, *see* Mandate at 13, the Court must engage in "an independent analysis" to determine whether his claims arising from this conduct survive summary judgment under the NYCHRL, *see Mihalik*, 715 F.3d at 109.

El Chaar cannot make out a *prima facie* case that he was treated less well than other candidates for the permanent chair position. Although the parties disagree on whether such surveys had been used for past hirings, *see* Pl. 56.1 ¶ 78; Def. 56.1 ¶¶ 176, it is undisputed that the NYUCD faculty completed identical surveys for all four finalists and that Bertolami "regularly solicited the faculty's feedback when selecting a chair." Def. 56.1 ¶¶ 172-73, 178. In addition, it is undisputed that Bertolami's decision to solicit written feedback on this occasion was shaped by the COVID-19 pandemic making it unsafe to gather the faculty in person. Def. 56.1 ¶ 174. El Chaar cannot show that NYUCD treated him less well by subjecting him to the same survey as other candidates, as part of a process that reasonably approximated pre-pandemic hiring procedures.

Additionally, assuming *arguendo* that El Chaar was subject to differential treatment, he has not raised an inference that such treatment was "because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. To the contrary, the record "establishes as a matter of law that discrimination . . . played no role in [NYUCD's] actions." *Ya-Chen Chen*, 805 F.3d at 76 (cleaned up); *see also Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 299–300 (S.D.N.Y. 2012) (granting summary judgment to employer under the NYCHRL where it "offered admissible evidence to support a legitimate, nondiscriminatory reason for its actions").

The executive committee decided not to rank El Chaar first because: (1) El Chaar was not on tenure track, while Leena Palomo, the ultimate appointee, was a tenured professor at Case Western Reserve University; (2) El Chaar was previously rejected for membership in a professional society; and (3) El Chaar used terms like "friends" and "enemies" to describe Department faculty. *See* Def. 56.1 ¶¶ 182–83. Further, it is undisputed that Bertolami relied on the survey in part to ensure the permanent chair was "someone with credibility[,] a consensus builder[,] and someone very good at interpersonal relationships," Def. 56.1 ¶¶ 169, 172, and that the survey results "reflected that some faculty thought very highly of" El Chaar "while others complained that he was 'vindictive,' 'divisive,' 'narcissistic,' holds grudges, provokes anxiety, and 'bullies' faculty and residents," *id*. ¶¶ 175, 177; *see also* ECF No. 38-49 (showing eighteen of the forty faculty members ranked El Chaar in last place with a score of four). Although two faculty members named in the OEO Complaint received the survey, there is no evidence that feedback from those two faculty members influenced the hiring decision. *See* Def. 56.1 ¶¶ 175–182, 202. Nor is there evidence that could lead a reasonable jury to doubt Bertolami's or the executive committee's basis for their decision.[6]

[6] El Chaar's attempts to manufacture inconsistencies are unavailing. *See* Opp. at 16–17. The fact that "[t]enure track was not a requirement for the position," *id.* at 16, does not preclude it from being a factor in choosing among qualified candidates. Similarly, no reasonable jury could conclude from El Chaar's observations about Bertolami's "announcement email to the executive group" and testimony regarding a meeting with the executive group during the hiring process, *id.* at 16–17, that the reasons given for selecting Palomo over El Chaar were pretextual.

Even though the NYCHRL applies a liberal standard to discrimination claims, it "still requires a showing of some evidence from which discrimination can be inferred." *Lugo v. City of New York*, 518 F. App'x 28, 30 (2d Cir. 2013) (summary order). Merely pointing to some survey respondents' negative opinions of El Chaar's character does not suffice, because "[t]here is nothing unlawful about . . . basing [a] hiring decision on subjective criteria" under the NYCHRL. *Campbell*, 860 F. Supp. at 299–300 (S.D.N.Y. 2012) (quotation marks and citation omitted). Because El Chaar fails to adduce evidence supporting an inference of discriminatory motive with respect to the hiring process for the permanent chair position, no reasonable jury could find that El Chaar was treated unfavorably because of his race or national origin on this basis.

3. Constructive Discharge

El Chaar offers one final theory in support of his argument that he was "treated less well because of a discriminatory intent," *Mihalik*, 715 F.3d at 110 (cleaned up): constructive discharge. *See Knight v. MTA – N.Y.C.*, No. 19 Civ. 1428, 2026 WL 875339, at *3 n.11 (E.D.N.Y. Mar. 31, 2026) (citation omitted) (explaining that constructive discharge is not a separate cause of action under the NYCHRL but rather provides a basis for discrimination or retaliation claims). Here, too, El Chaar has failed to raise a dispute of material fact.

El Chaar argues that he was constructively discharged in violation of the NYCHRL when he resigned because of NYUCD's failure to address the hostile work environment and retaliation against him. *See* Opp. at 27–28. Although the precise standard for constructive discharge under the NYCHRL is unsettled, it requires showing "deliberate actions taken by the employer sufficient to cause a reasonable person to feel compelled to resign." *Tulino v. City of New York*, 813 F. App'x 725, 727 & n.2 (2d Cir. 2020) (summary order); *see also Noh v. Admarketplace, Inc.*, No. 24 Civ. 2107, 2025 WL 965882, at *10 (S.D.N.Y. Mar. 28, 2025) (holding that to show constructive discharge under the NYCHRL, "the plaintiff must prove that the employer deliberately created

working conditions so intolerable, difficult or unpleasant that a reasonable person would have felt compelled to resign" (internal quotation marks and citations omitted)).

There is no evidence that Bertolami, or any other supervisor, deliberately created work conditions that were so intolerable, difficult, or unpleasant that a reasonable person would be compelled to leave. Indeed, as discussed above, El Chaar has not adduced admissible evidence that he suffered differential treatment at all during the limitations period. And although the Court concludes below that El Chaar has adduced evidence that he experienced retaliation when he was not appointed interim chair, it is undisputed that Bertolami believed at that time that El Chaar "would likely be the final choice for chair," Def. 56.1 ¶ 157, and that Bertolami sought to have El Chaar continue in his position as program director even after Bertolami decided to appoint Palomo as chair, *id.* ¶ 192, precluding an inference of deliberateness. El Chaar has, therefore, failed to show he was constructively discharged.

Because none of the three bases El Chaar offers in support of his NYCHRL claims of differential treatment—(1) hostile work environment, (2) discrimination with respect to the permanent chair hiring process, and (3) constructive discharge—survive NYUCD's motion summary judgment, NYUCD's motion is granted with respect to El Chaar's claims under N.Y.C. Admin. Code § 8–107(1)(a).

B. Retaliation (N.Y.C. Admin. Code § 8–107(7))

"To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that []he took an action opposing h[is] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Knight*, 2026 WL 875339, at *3 (quoting *Mihalik*, 715 F.3d at 112). Summary judgment dismissing a retaliation claim under the NYCHRL "should be granted only if no jury could find [the] defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination

thereof." *Robinson v. De Niro*, 739 F. Supp. 3d 33, 102 (S.D.N.Y. 2023) (quoting *Sanderson-Burgess v. City of New York*, 102 N.Y.S.3d 678, 680 (2d Dep't 2019)). A defendant's summary judgment motion, therefore, succeeds "only if the plaintiff cannot show that retaliation played any part in the employer's decision." *Mihalik*, 715 F.3d at 116. Even so, a plaintiff "still must establish that there was a causal connection between his protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [its conduct] was pretextual or motivated at least in part by an impermissible motive." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 246 (S.D.N.Y. 2021) (citation omitted and alterations adopted).

As with claims of less favorable treatment under § 8–107(1)(a), "federal civil rights statutes . . . serve . . . as a floor below which [NYCHRL] cannot fall," *id.* at 109 (internal quotation marks and citations omitted), so "to the extent that a plaintiff states a claim under Title VII . . . []he therefore necessarily states a claim under the NYCHRL." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 304 (S.D.N.Y. 2016).

El Chaar identifies two instances of purportedly retaliatory conduct: failure to appoint him as interim chair, and failure to appoint him as permanent chair. *See* Opp. at 14–16.

1. Failure to Appoint as Interim Chair

The Second Circuit has already held that El Chaar raises a genuine dispute of material fact as to whether the OEO Complaint was a but-for cause for his federal retaliation claim. *See* Mandate at 10. This holding is dispositive of El Chaar's parallel claim under the NYCHRL. Because El Chaar's retaliation claim with respect to the failure to appoint him interim chair survives summary judgment under federal law, it "necessarily" survives summary judgment under the NYCHRL's more generous standard. *Taylor*, 207 F. Supp. 3d at 304. Summary judgment on El Chaar's NYCHRL retaliation claim is, therefore, denied.

2. Failure to Appoint as Permanent Chair

El Chaar further argues that NYUCD's failure to appoint him to the permanent chair position also constituted retaliation for his filing the OEO Complaint. *See* Opp. at 18–20. Although it is undisputed that El Chaar took action to oppose NYUCD's alleged discriminatory conduct by filing the OEO Complaint, El Chaar has not shown a causal link between filing the OEO Complaint and NYUCD's decision not to appoint him as permanent chair.

El Chaar's claim that Bertolami "painted [him] as a complainer and a participant in his own hostile work environment and this label influenced and guided [Bertolami]'s decision-making" for the permanent chair appointment is unsupported. *See* Opp. at 19; *see also Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (explaining that courts cannot credit conclusory allegations on a summary judgment motion). As stated above, the record "establishes as a matter of law" that NYUCD had legitimate reasons for its decision to appoint Palomo rather than El Chaar as permanent chair. *Ya-Chen Chen*, 805 F.3d at 76 (quotation marks and citation omitted); *see supra* at 13–14. To reiterate, it is undisputed that Bertolami's preferences and criteria for the permanent chair included a candidate who was "a tenured full professor," a "consensus builder," and "very good at interpersonal relationships." Def. 56.1 ¶ 169. El Chaar concedes that he was not a tenured professor, and he does not deny that "he was emotional and divisive, using terms like 'friends' and 'enemies' to describe faculty in the Department." *Id.* ¶ 183. El Chaar further concedes that he was the executive committee's second choice for the position and that if Palomo had not accepted the position, he would have been appointed, which further undermines any inference of retaliation. *Id.* ¶¶ 183, 186.

El Chaar's sole support "under any. . . evidentiary route[]" to demonstrating retaliatory motive, *Robinson*, 739 F. Supp. 3d at 101, is Bertolami's reference to the OEO Complaint in the interim chair appointment context. But there is no evidence to suggest that the OEO Complaint was a motivating factor in Bertolami's decision not to appoint El Chaar to the permanent chair position two

years later. *See* Mandate at 11. Indeed, El Chaar does not dispute that, notwithstanding Bertolami's statement about the impact of the OEO Complaint on the *interim* chair appointment process, Bertolami "believed that once the [*permanent* chair] search opened . . . [El Chaar] would likely be the final choice." Def. 56.1 ¶ 157. To the extent that El Chaar contends an inference of causation exists due to the temporal proximity of Bertolami's 2018 comment about the OEO Complaint to Bertolami's decision not to appoint El Chaar as permanent chair, "evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL." *Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) (summary order). NYUCD's motion for summary judgment on El Chaar's NYCHRL retaliation claim is, therefore, granted with respect to the decision not to appoint him as permanent chair.

**CONCLUSION**

For the foregoing reasons, NYUCD's motion for summary judgment is GRANTED as to El Chaar's NYSHRL claims, his NYCHRL claims under N.Y.C. Admin. Code § 8–107(1)(a), and his NYCHRL claims under § 8–107(7) with respect to the decision not to appoint him as permanent chair. NYUCD's motion is DENIED as to El Chaar's NYCHRL cause of action pursuant to § 8–107(7) for retaliation with respect to NYUCD's decision not to appoint him to the interim chair position. The remaining claims to proceed to trial are El Chaar's retaliation claim with respect to NYUCD's failure to appoint him to interim chair under 42 U.S.C. § 1981 and the NYCHRL. By **November 17, 2026**, the parties shall file a joint letter indicating whether they wish to be referred for a settlement conference before the Honorable Stewart D. Aaron on the remaining claims.

SO ORDERED.

Dated: October 26, 2026
New York, New York

ANALISA TORRES
United States District Judge